1

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (SBN 295032)
2
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
3
Telephone: 415-839-7077
Facsimile: (888) 410-0415
4
E-Mail: yeremey@skclassactions.com

5

**SMITH KRIVOSHEY, PC**
6
Joel D. Smith (SBN 244902)
867 Boylston Street, 5th Floor #1520
7
Boston, MA 02116
Telephone: 617-377-4704
8
Facsimile: (888) 410-0415
E-Mail: joel@skclassactions.com
9

10

*Attorneys for Plaintiff*
11

12

13

**UNITED STATES DISTRICT COURT**
14

**CENTRAL DISTRICT OF CALIFORNIA**

15

16 | ZACHARY MCKINNEY, on behalf of himself and all others similarly situated,

17

Case No. 2:24-cv-4338

18 | Plaintiff,

**CLASS ACTION COMPLAINT**

v.
19

20 | MUNCHKIN, INC.,

**JURY TRIAL DEMANDED**

Defendant.
21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Plaintiff Zachary McKinney ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following on information and belief, except that Plaintiff's allegations as to her own actions are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a putative class action lawsuit on behalf of purchasers of Defendant Munchkin, Inc.'s Nursery Fresh brand 8-pack diaper pail refill bags (the "Refill Products" or "Refill Cartridges") against Defendant for manufacturing, distributing, and selling underfilled and mislabeled Refill Products. The disposable diaper market is a massive, multi-billion market industry. Diaper pails are effectively trash bins designed to store used disposable diapers. At its heart, this case is simple. While Defendant markets the Refill Products as providing a "1 YEAR SUPPLY" of diaper bags for its diaper pales, the Refill Products provide far less than advertised. Similarly, Defendant's representation that the Refill Products "Holds Up To 2176 Diapers" is false and misleading because no reasonable consumer could ever hope to fit anywhere near that number of soiled diapers into the Refill Products over the course of a year. The deception is stark, and preys on new parents yearning to simplify their lives, believing that they are buying a product that will ensure they do not have to repeatedly run to the store to buy more diaper disposal bags. Instead, parents pay a premium for an advertised year's worth of product, but receive a small fraction of what Defendant promises on the Refill Products' labels and advertising.

2.    The Refill Products are meant to be used as part of a diaper pail system. Specifically, the front label of the Refill Products state that they "Fit[] ALL Diaper Genie Complete, Elite, Essentials & 'Mini' Pails, as well as Munchkin PAIL & STEP Diaper Pails." These are all various brands of diaper pails, but all function in the same manner.

3.      A diaper pail is effectively a large plastic container and lid meant to contain odor coming from soiled diapers.  One of its key advertised benefits is the ability to easily swap out bags of soiled diapers without having to replace a plastic bag each time as in a traditional trash can, as the system comes with a built-in bag disposal and sealing mechanism.  Diaper pail systems require a Refill Cartridge,[1] which consist of a plastic ring that releases a continuous plastic bag that can be cut off and tied to form the "ends" of the bag, with diapers put through the center of the ring and into the bag.  After the container is filled with dirty diapers, the continuous plastic bag from the Refill Cartridge can be tied off and cut, thereby sealing all the diapers trapped inside for disposal.  After cutting off the dirty diaper bag, customers can dispense more plastic from the Refill Cartridge, to form more bags, until the entire Refill Cartridge is used up – requiring the replacement of a Refill Cartridge. For lack of a better descriptor, the string of diaper bags released by the Refill Cartridges is at times referred to as a "diaper sausage," with customers able to separately cut each "sausage" for disposal before releasing the next bag for diapers.

4.      The following shows basic images of how a diaper pail system and Refill Cartridges work.  In the photo on the left, the diaper pail is closed, with all soiled diapers inside.  In the photo in the center, the diaper pail's front door is opened to reveal a plastic bag, dispensed from a Refill Cartridge, containing soiled diapers.  In the image on the right, an unused Refill Cartridge is shown.

---

[1] Just as there are many brands of diaper pails, there are also many brands of diaper pail refill cartridges.  The Refill Products here are meant to be compatible with many different brands of diaper pails, including Defendant's own Munchkin branded diaper pails.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

  

5.     Before securing a Refill Cartridge in a diaper pail, a customer pulls on the end of the continuous plastic bag and ties the end, as can be seen below.



6.      A Refill Cartridge, with the bag extended and tied on the bottom, is then placed in the diaper pail, with the top end of the bag open so that customers can insert soiled diapers, as seen below.

7.      When the plastic bag is full, a customer has to open the front door of the diaper pail, cut the top of the plastic bag that is still attached to the refill cartridge, tie off the top end, and form an individual bag that can then be separately discarded, as seen below.[2]



_____

[2] The image shows a Diaper Genie branded diaper pail refill cartridge, but the process is identical as for the Refill Products at issue here and is shown for illustrative purposes only.

8.     The side label of the Refill Cartridges summarizes the above process with the following illustration:



9.      After discarding the full bag, customers can then pull on the plastic emanating from the Refill Cartridge, tie off the bottom end, and repeat the process of making more plastic bags until the entire Refill Cartridge is used up.  At that point, customers must dispose of the empty Refill Cartridge and swap in a new Refill Cartridge, starting the process over again.

10.     Consumers, typically parents or guardians of babies, look to diaper pail systems to limit odor in their homes and ensure that the constant diaper-changing process is no more difficult than necessary.  Thus, when shopping for such a system, consumers are drawn to any marketing that suggests simplicity, and Defendant has certainly capitalized on that demand.  Defendant falsely labels its Refill Products with the advertisement "1 YEAR SUPPLY," even though the Refill Products are incapable of holding the number of diapers that all but the smallest minority of babies go through in a year.  The vast majority of consumers that use Defendants' Refill Products do not receive a one-year supply of the Products even when following all stated instructions and using the Products as intended. Defendants are accordingly misleading consumers into purchasing a stated, precise sum of Refill Products, but delivering far less than promised.

11.     All of Defendants' Refill Products feature the same deceptive advertising.  As shown below, for example, the front *and* back labels of the Refill Products prominently state that the products will provide a "1 YEAR SUPPLY." And, the front and back (and top) labels of the Refill Products state "HOLDS UP TO 2176 DIAPERS."  Collectively, the "1 YEAR SUPPLY" and "HOLDS UP TO 2176 DIAPERS" statements are referred to herein as the "Duration Claims."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FRONT LABEL**



**BACK LABEL**



**TOP LABEL**



12.    The Duration claims prominently appear on the front, back, and top labels of the Refill Products, using the exact same image as depicted above, ensuring that consumers see them and rely on them when purchasing the Refill Products.

13.    All Refill Products at issue here consist of 8 individual refill cartridges. Thus, according to Defendants' labeling and marketing, 8 refill cartridges will provide an entire year's supply of Refill Products.

14.    All of Defendants' Duration Claims, are false and misleading.

15.    On the side panel of Defendants' Refill Products, Defendants provide the following chart that completely contradicts (though not in a way that would be

understood by a reasonable consumer) the representations on the front, back, and top labels of the Products concerning their ability to hold up to 2176 diapers, and the "1 YEAR SUPPLY" claim:



16.     Defendant's math does not hold up.  Using Defendant's own math shows the complete absurdity of its prominent claim that the 8 pack of the Refill Products provides a "1 YEAR SUPPLY" of diaper bags.  As demonstrated in Table 1 below, Defendant's Duration Claims suggest that a newborn baby will only require 5.96 diapers per day, down to 2.45 diapers per day for babies over 27 pounds.

| Table 1 | | | |
|---|---|---|---|
| **Diaper Size** | **Defendants' Estimated Diaper Capacity Per Cartridge** | **Defendants' Estimated Diaper Capacity of a "1 Year Supply" Package[3]** | **Number Of Diapers Used Per Day According To Defendants[4]** |
| **0** (Newborn) < 10 lbs | 272 | 2,176 | 5.961 |
| **1** 8-14 lbs | 240 | 1,920 | 5.260 |
| **2** 12-18 lbs | 192 | 1,536 | 4.208 |
| **3** 16-28 lbs | 176 | 1,408 | 3.857 |
| **4** 22-37 lbs | 144 | 1,152 | 3.150 |
| **5** 27-35 lbs[5] | 112 | 896 | 2.454 |

17.    As discussed below, experts, academia, pediatricians, and Defendant's competitors agree that most babies require far more diapers - *roughly twice as many* - than Defendant has budgeted in their equations.  Indeed, babies that truly use as few diapers as implied by Defendant's math are either being improperly taken care of by their caregivers (thereby subjecting the babies to health risks), or have health issues that are abnormal.  A baby that only uses the number of diapers budgeted by Defendant should immediately seek medical attention, as low urination and defecation are major red flags that something is wrong with the baby.  Accordingly, the vast majority of consumers will use far more diapers (roughly twice as many) over the course of a year than would fit in Defendant's "1 YEAR SUPPLY" of diaper bags, making the statement false and misleading.  Indeed, consumers would effectively have to buy *two* of Defendant's "1 YEAR SUPPLY" of Refill Cartridges

---

[3] Arrived at by multiplying the diaper capacity per cartridge times 8, the number of cartridges in a "1 year supply" pack.

[4] Arrived at by dividing the number in the preceding column, the "1 Year Supply" of diapers, by 365, the number of days in a calendar year.

[5] Relative weights for sized diapers is fairly consistently used within the industry according to the weights and sizes depicted in this Table. *See, e.g.*, https://www.today.com/parents/babies/complete-guide-diaper-sizes-rcna11710

to dispose of an average year of diapers, meaning that consumers receive roughly *half* of what Defendant promises on the Products' labels.

18.     Further, Defendant's representations that Refill Products hold up to 2176 diapers are also false and misleading.  Each of these representations assumes misleadingly that *only newborn diapers will be put into the diaper pale*.  But, unless something is terribly wrong, the vast majority of babies are no longer newborn size by the time they are, *e.g.*, two months, four months, eight months, ten months, and eleven months old.  Accordingly, it is not conceivable that any healthy baby would ever be able to use the number of diapers (2176) prominently listed on the front, back, and top of Defendant's labeling, as the number of diapers that can fit in Defendants' Refill Products necessarily decreases over time as the baby gets older and bigger (and the associated amount of urine and waste, as well as the size of the diapers, get bigger as well).  No healthy baby could have 2,176 diapers fit in Defendants' Refill Products because the baby, by definition, would only be a "newborn" for a fraction of that time, whereas Defendant's 2,176 representation assumes that the baby stays an infant the entire time.

19.     Defendant engaged in widespread false and deceptive marketing and labeling of their Refill Products.  Defendant employs a classic bait-and-switch scheme by promising more product than is actually delivered to unsuspecting consumers.  Accordingly, Plaintiff seeks relief in this action individually, and on behalf of all purchasers of Defendant's Refill Products, for Defendant's violations of the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §§ 501.201-213, and for breaches of express and implied warranty and fraud.

**PARTIES**

20.     Plaintiff Zachary McKinney is a citizen and resident of the state of Florida, residing in Lake Worth.  On or around February or March 2023, Plaintiff purchased an 8 pack of Defendants' Refill Products for use in his home from a

Walmart in Boynton Beach, Florida.  Prior to his purchase of Refill Products, Plaintiff reviewed the product's labeling and packaging, saw that the Refill Products would purportedly be able to hold 2176 diapers and would provide a "1 YEAR SUPPLY."  Plaintiff relied on those representations to choose the Refill Products over comparable products.  Plaintiff saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that the Refill Products would last an entire year and be capable of holding up to 2176 diapers in real world use.  Plaintiff relied on the representations and warranties that the products would last the duration stated in deciding to purchase the Refill Products.  Accordingly, these representations and warranties were part of the basis of the bargain, in that Plaintiff would not have purchased Refill Products on the same terms or would not have purchased the Refill Products at all had Plaintiff known these representations were not true.  However, Plaintiff remains interested in purchasing Refill Products and would consider Refill Products in the future if Defendant ensured the products would actually last as long as represented.  In making the purchase, Plaintiff paid a substantial price premium due to the false and misleading Duration Claims.  However, Plaintiff did not receive the benefit of the bargain because the Refill Products did not, in fact, last for the duration specified and did not provide as much product as advertised.

21.    Plaintiff used the Refill Products as directed by the product's packaging for his baby.  Rather than the one year supply that was promised, Defendant's Refill Cartridges ran out after only five to six months of normal use. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

22.    Defendant Munchkin, Inc. is a Delaware corporation with its principal place of business located at 7835 Gloria Ave., Van Nuys, CA 91406.  Defendant conducts substantial business throughout the United States and in the State of California.  Defendant manufactures, advertises, sells, distributes, and markets the

Refill Products as alleged herein nationwide, including in California.  Defendant's false, misleading, and incomplete labeling and advertising of the Refill Products was conceived, reviewed, approved, and otherwise controlled from Defendant's California headquarters.  Defendant's misleading marketing concerning the Refill Products was coordinated at, emanated from, and was developed at its California headquarters.  All critical decisions regarding the Refill Products were made in California.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and most members of the proposed class are citizens of states different from Defendant.

24.    This Court has personal jurisdiction over Defendant because they conduct substantial business within California, including sale, marketing, and advertising of the Refill Products.  Defendants have purposefully availed themselves in California by selling the Refill Products in California.  The Court also has general jurisdiction over Defendant because it is headquartered in California.

25.    Venue is proper in this District because Defendant is headquartered in this District, and made all critical decisions concerning the Refill Products in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.    Background On The Diaper Industry**

26.    The disposable diaper industry is a booming one.  As of 2020, the "global baby disposable diaper market was valued at around $43 billion," and is

expected to "reach a valuation of $60 billion by 2031."[6]  The "[c]onstant need for diapers in a child's life up to a certain age makes this market an evergreen one, with lucrative opportunities for market participants."[7]  Indeed, "1 in every 3 U.S. families has reported diaper needs," and with "5 million three-year-olds in the United States," the industry's projected expansion is not a shock.

27.    The diaper pail market is a similarly booming industry, "poised to grow by $162.24 million during 2021-2025."[8]  The market is driven by "the competitive pricing of diaper pails, increasing awareness of the importance of maintaining baby hygiene in developing countries, and innovation and portfolio extension leading to product premiumization."[9]  And, "the sales for diaper disposal bags are expected to rise in the coming years" to continue the industry's growth trajectory.[10]

28.    Disposable diapers, as well as the disposal of such diapers, are not cheap.  A common theme running through parent-advice articles is to budget for diapers accordingly, as "parents can expect to shell out a sizable sum over the years" on diapers and their disposal alone.[11]  "The average diaper costs anywhere from $0.20 to $0.30.  Assuming your baby uses 2,500-3,000 diapers in their first year of

---

[6] "Baby Disposable Diaper Market Outlook," Fact.MR, https://www.factmr.com/report/79/baby-disposable-diaper-market

[7] *Id.*

[8] Business Wire, "Global Baby Diaper Pails Market Report 2021-2025 – Market is Poised to Grow by $150+ Million," https://www.businesswire.com/news/home/20211028005865/en/ Global-Baby-Diaper-Pails-Market-Report-2021-2025---Market-is-Poised-to-Grow-by-150-Million---ResearchAndMarkets.com

[9] *Id.*

[10] *See* Commerce.Ai, "Diaper Disposal Bags," https://www.commerce.ai/reports/diaper-disposal-bags-diaper-pails-refills-updated-may-2021

[11] Harris, Nicole, "Here's How Many Diapers Your Baby Really Needs," Parents.com, https://www.parents.com/parenting/money/saving/save-money-and-build-a-diaper-stockpile/

---

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED                    16

life, you can expect to spend about $500-$900 on an annual supply."[12]  This estimate "doesn't count the cost of other diapering supplies," such as disposal products, wipes, or a changing table.[13]

29.     Because of the extreme cost of disposable diapers and their associated products, parents and guardians are constantly looking for ways to save money on these products.  Much of the advice given to these consumers is that "[s]tocking up can save you money in the long run," or "[a]s with most things, you can save money by buying diapers in bulk."[14]  This advice translates to products needed in conjunction with disposable diapers, such as diaper pail systems and their associated disposal bags.

**B.     Background On Typical Infant Diaper Usage**

30.     Pediatricians, hospitals, and experts agree that babies consume up to 12 diapers a day when they are infants, and will gradually average about 6 diapers a day over the course of a baby's diaper-wearing career. [15]   "Most U.S. parents will go through nearly 3,000 diapers during their baby's first year alone."[16]  While there appears to be range of estimated diaper usage by experts, the range is universally higher than the numbers budgeted by Defendant's labeling.  For instance, the Icahn School of Medicine at Mount Sinai states that new parents should expect to use between "8 to 10 [diapers] per day."[17]  Kaiser Permanente, which operates one of the largest healthcare plans in the nation, states that parents of infants "should see at

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Laura A. Jana, MD, FAAP & Jennifer Shu, MD, FAAP, "Changing Diapers," HealthyChildren.org, https://www.healthychildren.org/English/ages-stages/baby/diapers-clothing/Pages/Changing-Diapers.aspx
[16] *Id.*

[17] Mount Sinai, "Baby supplies you need," https://www.mountsinai.org/health-library/selfcare-instructions/baby-supplies-you-need

least 6 to 10 wet diapers every day," *plus* a few soiled diapers.[18]  According to Johns Hopkins, infant babies "should wet at least six to eight diapers a day," plus a few soiled diapers.[19]  And, according to WebMD, infants should need five or six disposable wet diapers per day, "plus two to five poopy ones each day," for a total of 7 to 11 diapers per day.[20]  Pampers, likely the leading disposable diaper brand in the world, states that "[e]xperts recommend that you change your newborn's diapers every two to three hours," for a total of 8 to 12 diapers a day.[21]  Most magazine and online publications estimate that babies need between 2,500 to 3,000 diapers over the course of the first year.[22]

31.    By infant size, diaper usage is roughly broken down as follows in the table below:

---

[18] Kaiser Permanente, "Baby's Diapers: What's Normal, What's Not," https://mydoctor.kaiser permanente.org/ncal/article/babys-diapers-whats-normal-whats-not-1213280

[19] Johns Hopkins Medicine, "Basic Care," https://www.hopkinsmedicine.org/howard_county_ general_hospital/services/mothers_and_babies/taking_baby_home/basic-care.html

[20] Booth, Stephanie, "Is My New Baby Eating Enough?" Grow by WebMD, https://www.webmd.com/parenting/baby/new-baby-eating-enough

[21] Pampers, "How Often Should You Change Your Baby's Diaper?" https://www.pampers.com/ en-us/baby/diapering/article/how-often-to-change-diaper

[22]*See, e.g.*, Miller-Wilson, Kate, "How Many Diapers Does a Baby Use in a Year?" *Love to Know*, https://baby.lovetoknow.com/baby-care/how-many-diapers-does-baby-use-year; *see also* "How Many Diapers Does A Baby Use In The First Year?" *The Suburban Mom*, https://www.thesuburbanmom.com/2014/02/17/how-many-diapers-does-a-baby-use-in-the-first-year/; "How Many Diapers Does a Baby Use?" *Happiest Baby*, https://www.happiestbaby.com/blogs/baby/how-many-diapers-does-baby-use; Harris, Nicole, "Here's How Many Diapers Your Baby Really Needs"

| DIAPER SIZE | ESTIMATED AGE BABIES USE THIS SIZE | ESTIMATED DIAPER USE PER DAY |
|---|---|---|
| **0** (Newborn) < 10 lbs | A few weeks | 8 to 12 |
| **1** 8-14 lbs | Until 4 months old | 8 to 10 |
| **2** 12-18 lbs | 3-8 months old | 8 to 9 |
| **3** 16-28 lbs | 5-24 months old | 6 to 7 |
| **4** 22-37 lbs | 18-36 months old | 5 to 7 |

32.     Should a caregiver notice that a baby is going through "fewer than 6 wet diapers in 24 hours after breast milk is in, or after 4 days old," they are instructed to seek medical advice, as this can be a symptom of something sinister.[23]  Indeed, "if your baby does not have many wet diapers, there could be hydration or other medical issues.  A lack of soiled diapers could be anything from simple constipation to other digestive issues.  The amount of soiled or wet diapers can easily be a good indication that your baby is getting enough to eat and drink each day."[24]

33.     It is not recommended to leave babies in soiled diapers, as "[u]rine and bacteria can lead to rashes which are painful and hard to treat."[25]  As a result, parents and guardians are instructed that "[d]iapers need to be changed as soon as you notice they are soiled," which translates to changing diapers constantly.[26]

34.     One problem that can arise from less frequent diaper changes is diaper dermatitis, or "inflammation of the skin in the diaper area."[27]  While this is a relatively common condition, it "is a condition which causes considerable parental

---

[23] Kaiser Permanente, "Baby's Diapers: What's Normal, What's Not

[24] New Kids-Center, "How Many Diapers Does a Baby Use a Day?" New Kids-Center https://www.newkidscenter.org/how-many-diapers-a-day.html

[25] *Id.*

[26] *Id.*

[27] Johns Hopkins Medicine, "Diaper Dermatitis," https://www.hopkinsmedicine.org/health/conditions-and-diseases/diaper-dermatitis

anxiety."[28]  Results from a study examining common causes of diaper dermatitis found that there was a "significant association between reduced frequency of diaper changes and both current and recurrent episodes of diaper dermatitis."[29]

35.    Other common issues that can result from infrequent enough diaper changes can include yeast infections, chafing, bladder infections, and staph infections – all afflictions parents are desperate to help their children avoid.[30]

36.    According to Pampers, "Experts recommend that you change your newborn's diaper every two to three hours, or as often as needed … there are a few health reasons to consider as well: Overtly wet diapers left on too long can contribute to the risk of diaper rash; Poop can irritate your baby's skin; Leftover bacteria may lead to a bladder infection (especially in baby girls)."[31]  And there are other problems to consider, such as the fact that "a soiled diaper can cause leaks, and the mess can spread to your baby's clothes, crib, car seat – you name it!  The simplest way to avoid the mess is with frequent diaper changes."[32]

37.    Put simply: frequent diaper changes are crucial to keeping infants healthy.  Monitoring diaper change frequency and the conditions of a baby's soiled diaper are key methods to ensuring that a baby is eating and drinking enough, and not falling victim to any of the health issues that can arise from infrequent diaper changes.

38.    The vast majority of parents use far more diapers over the course of a year than would fit into Defendant's Refill Products.  As discussed above, Defendant's labeling states that its "1 YEAR SUPPLY" of Refill Products holds up

---

[28] Adalat, Shazia et al., "Diaper dermatitis – frequency and contributory factors in hospital attending children," *Pediatric dermatology* vol. 24, 5 (2007).

[29] *Id.*

[30] Wehrli, Ashley, "15 Dangers Of Not Changing Your Baby's Diaper Fast Enough," https://www.babygaga.com/15-dangers-of-not-changing-the-babys-diaper-fast-enough/

[31] Pampers, "How Often Should You Change Your Baby's Diaper?"

[32] *Id.*

to 2,176 *newborn* diapers, 1,920 diapers for 8-14 pound babies, 1,536 diapers for 12-18 pound babies, 1,408 diapers for 16-28 pound babies, 1,152 diapers for 22-37 pound babies, and 898 diapers for babies over 27 pounds. *See* Table 1. Because an average baby weighs roughly 20 pounds at one year of age,[33] Defendant's labeling effectively budgets for fitting 1,408 to 2,176 diapers over the course of a baby's first year of life. But, of course, no baby stays an infant for an entire year. Indeed, by six months of age, the average baby weighs over 16 pounds, more than double its birth weight, and about 20 pounds at one year old.[34] Thus, Defendant's labeling anticipates that a consumer would only need to dispose of roughly 1,700 diapers over the course of a year. Further, Defendant's labeling anticipates that a newborn would need to dispose of less than 6 diapers per day, and that babies weighing as few as 16 pounds (the average weight of a 6-month old) *would need to dispose of less than 4 diapers per day*. *See* Table 1. These figures are so obviously divorced from real life that Defendant knew, on information and belief, that their labeling was false and misleading.

39.    As discussed above, an average baby will need to dispose of roughly twice as many diapers as can physically fit in Defendant's purported "1 YEAR SUPPLY" of Refill Cartridges. Reasonable consumers do not pull out calculators or conduct medical research in a store aisle to calculate whether Defendant's labeling is true and accurate. Instead, reasonable consumers rely on Defendant's labeling, expecting to receive a "1 YEAR SUPPLY" of diaper bags. In practice, consumers receive roughly half of what Defendant promised and warranted to them on the Products' labeling, thereby losing money both at the initial point of purchase and

---

[33] Miles, Karen, "Average weight and growth chart for babies, toddlers, and kids," https://www.babycenter.com/baby/baby-development/average-weight-and-growth-chart-for-babies-toddlers-and-beyo_10357633#average-baby-weight-and-length-chart-by-month
[34] *Id.*

through having to buy additional diaper disposal products to make up for the amount of Refill Cartridges that Defendant shorted them.

## C.   Defendant's Hidden And Deceptive Disclosures

40.   As can be seen in the images above, the statement "1 YEAR SUPPLY" has a small cross next to it in the shape of a crucifix, while the statement "HOLDS UP TO 2176 DIAPERS" has a tiny single asterisk next to it.  First, a reasonable consumer may never think that a crucifix is meant to function as an asterisk, and would have no reason to think that the "1 YEAR SUPPLY" claim is meant to be disclaimed elsewhere on the label.  In any case, Defendant has intentionally hidden the associated asterisk and cross (and the disclosure language to which they relate) in a place on the Products' packaging that effectively guarantees that reasonable consumers would not see them.  The associated crucifix and asterisk (and their disclosure language) do not appear on the front, back, sides, or even the top of the Refill Products' labels.  Even if a consumer physically inspected all four sides and top of the Refill Products' packaging, they would never find the associated asterisk and crucifix – because they are not there.

41.   As demonstrated below, Defendant has effectively guaranteed that reasonable consumers acting reasonably under the circumstances (when they are standing in a store isle deciding whether to buy the Products) would not see the associated asterisk or crucifix because they appear solely in tiny font on the *bottom* side of the Refill Products' packaging.  Without someone pointing out the disclosures, a reasonable consumer would not locate them.  The red arrow below refers to the relevant crucifix and asterisk and disclosures.  Notably, the Refill Product packaging is flipped upside down in the photos to display the bottom.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





42.    As can be seen above, even if a consumer were for some reason to think
to flip the Refill Products upside down, they would still be hard pressed to find the
disclosures because they are written in a font so small as to be nearly illegible.
Reasonable consumers do not come to stores with a magnifying glass.

43.     The total height of the Refill Products is approximately 16 inches, as depicted below.  The "1 YEAR SUPPLY" statement, with its green border, runs the entirety of the 16 inches.



1    44.    The relevant asterisk and crucifix, and their associated disclosures, are

2    roughly one sixteenth of an inch high hidden on the bottom of the Refill Products'

3    packaging.  The size is so small that reasonable consumers with less than perfect

4    vision would not be able to decipher them even if they were able to locate the

5    disclosures.

6

7

8

9

10

11

12    

13

14

15

16

17    45.    Despite being intentionally designed to ensure that reasonable

18    consumers never see them, the disclosures are themselves false and misleading.

19    Further, the disclosures demonstrate the falsity of the Duration Claims prominently

20    made elsewhere on the Products' labels.

21    46.    For instance, the disclosure relating the to the "1 YEAR SUPPLY"

22    claim states "Based on 25% of diaper changes taking place outside of the home."  In

23    effect, Defendant is stating that the Refill Products can provide no more than a nine

24    month supply (75% of 1 year is 9 months) for the majority of consumers who change

25    the vast majority of their diapers inside of the home.  The Products are intended for

26    parents with children primarily between the ages of 0-2, diaper-wearing years.  For

27    children under the age of 2, significantly more than half do not go to daycare but are

28

rather cared for in the child's home by a parent, caretaker, or relative.[35]   The average, reasonable consumer will dispose of virtually all – likely well above 95% - of their children's diapers inside the home.  No reasonable consumer would expect the "1 YEAR SUPPLY" claim to be true only if they disposed of 25% of their diapers outside the home.  The statement appears absolute on the labels – it does not say "Up To 1 YEAR SUPPLY" or "1 YEAR SUPPLY ONLY IF 25% OF DIAPERS ARE DISPOSED OF SOMEWHWHERE OTHER THAN THE REFILL CARTRIDGES."

47.     In any case, as discussed above, the Products do not even provide a nine-month supply, making the disclosure false and misleading.  Reasonable consumers using the Products as intended typically will receive no more than six months of supply from the Products even if 25% of diapers were to be disposed of outside the home.

48.     Likewise, the disclosure associated with the statement "HOLDS UP TO 2176 DIAPERS" is misleading.  That disclosure states, "Based on newborn sized diapers."  As discussed above, because no baby stays an infant for an entire year, it is very likely that not a single consumer using the Products could ever hope to fit 2,176 diapers into the Refill Products.  The 2176 DIAPERS claim, even if literally true (and Plaintiffs do not contend that it is), is nevertheless misleading because *not one* reasonable consumer would be able to fit that many diapers using the Refill Cartridges in the real world.

49.     In the real world, consumers report that the Refill Cartridges do not last anywhere near an entire year, or even nine months.  The below online reviews of Defendant's Refill Cartridges are illustrative, putting Defendant on notice of the falsity and misleading nature of Defendant's Duration Claims:

---

[35] *See* National Center for Education Statistics, https://nces.ed.gov/fastfacts/display.asp?id=4

1

⭐⭐⭐☆☆  **Year supply lasted 5 months**

Reviewed in the United States on January 5, 2018

2

Style: Waste Bag | Verified Purchase

3

They work fine.

The box says 1 year supply.

4

Our last order was September 1.

5

Today is January 4 and we are ordering again.

That's 5 months, not 12.

6

7

⭐⭐⭐⭐☆  **Perfect for Munchkin Diaper Pails!**

Reviewed in the United States on May 25, 2023

8

Style: Waste Bag | Verified Purchase

9

I have the munchkin diaper pail and was tired of paying the price for the munchking diaper pail refills. I finally came across these and they fit perfectly ! I have two

10

little boys so we go through the pack in about 2-3 months (give or take), but it is super convenient to have the pail right next to the changing station. I do

recommend (with any diaper pail), cleaning out the pail regularly. There will always be a smell.

11

12

⭐⭐⭐☆☆                                          9/22/2019

13

14

**Not a year supply.**

15

One year supply lasted a little over two months with twin

16

20 month olds. Bags are decent. I try to save every inch

possible when tearing old bag off, but I can not see how

17

these are to even last 6 months, let alone a year with one

child.

18

19

20

⭐⭐⭐⭐⭐  **MLR816** · 4 years ago

21

**Timeframe not a year supply**

22

It says this is a year supply but it only lasted 6 months for us. Otherwise

the bags are great

23

24

**Recommends this product**  ✓ Yes

25

26

27

28



★★★★☆ Alfaan · 6 years ago

**Great product**

The diaper refills are great and do the job.
The only reason I gave it 4 stars is because the box says "1 year supply" but the 8 pack only lasted 7 months.

★★★★☆ Corkie86 · 6 years ago

**Good for all diaper pails/genies**

Good for all diaper pails/genies. Worth the money compared to real diaper genie bags. Says it's a years supply though but usually last around 6 to 8 months depending on how old your baby is. Watch for them to go on sale really good deals



So glad I bought these, each bag last me approx. 3 weeks. They also keep the smell under control.

★★★★★ Villa 84 · 6 years ago

**Works great**

This pack lasted me 5months, just as good as the brand name

50.    The above reviews are just a sampling of numerous reviews consumers have left regarding Defendant's deceptive Duration Claims.  These consumer complaints underscore the artifice devised and employed by Defendant uses to lure and deceive millions of consumers into purchasing significantly less product than they believe they are paying for.

## **CLASS ACTION ALLEGATIONS**

51.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

52.     Plaintiff seek to represent a class defined as all persons in the United States who, between four years prior to the filing of the original Complaint in this action and the date that class notice is disseminated, purchased Defendant's Refill Products (the "Class").  Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

53.     Plaintiff also seeks to represent a subclass consisting of Class Members who reside in Florida (the "Florida Subclass" or "Subclass").

54.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class and Subclass may be expanded or narrowed by amendment or amended complaint.

55.     **Numerosity.**  The Class and Subclass Members are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of Members in the Class and Subclass.  Although the precise number of Class and Subclass Members is unknown to Plaintiff, it is known by Defendant and may be determined through discovery.

56.     **Commonality.**  Common questions of law and fact exist as to all Members of the Class and Subclass and predominate over any questions affecting

only individual Class or Subclass members.  These common legal and factual questions include, but are not limited to, the following:

    a.  Whether Defendant made false and/or misleading statements to the consuming public concerning the amount of disposal bags provided by the Refill Products;

    b.  Whether Defendant omitted material information to the consuming public concerning the actual amount of disposal bags in the Refill Products;

    c.  Whether Defendant's labeling and packaging for the Refill Products is misleading and/or deceptive;

    d.  Whether Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising and sale of the Refill Products;

    e.  Whether Defendant's representations concerning the Refill Products were likely to deceive a reasonable consumer;

    f.  Whether Defendant's omissions concerning the Refill Products were likely to deceive a reasonable consumer;

    g.  Whether Defendant represented to consumers that the Refill Products have characteristics, benefits, or qualities that they do not have;

    h.  Whether Defendant advertised the Refill Products with the intent to sell them not as advertised;

    i.  Whether Defendant falsely advertised the Refill Products;

    j.  Whether Defendant made and breached express and/or implied warranties to Plaintiff and Class and Subclass Members about the Refill Products;

    k.  Whether Defendant's representations, omissions, and/or breaches caused injury to Plaintiff and Class and Subclass Members; and

l.   Whether Plaintiff and Class and Subclass Members are entitled to damages.

57.   **Typicality.**  Plaintiff's claims are typical of the claims of the other Members of the Class and Subclass in that, among other things, all Class and Subclass Members were deceived (or reasonably likely to be deceived) in the same way by Defendant's false and misleading advertising claims about the probable longevity of the Refill Products.  All Class and Subclass Members were comparably injured by Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

58.   **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Members of the Class and Subclass.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class and Subclass.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class or Subclass.

59.   **Predominance.**  Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class and Subclass.  The Class and Subclass issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

60.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and Subclass Members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for Class or Subclass Members to obtain effective redress on an individual basis for the wrongs committed against them.  Even if Class or Subclass Members could afford such individualized

litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. It would also increase the delay and expense to all parties and the court system from the issues raised by this action.  The class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

61.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSES OF ACTION

## COUNT I

## BREACH OF EXPRESS WARRANTY

### (On Behalf The Class and Subclass)

62.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

63.    Plaintiff brings this claim individually and on behalf of the Members of the proposed Class and Subclass against Defendant.  The Class will proceed under California law, while the Subclass will proceed, in the alternative, according to Florida law.

64.    As the designer, manufacturer, marketer, distributor, and/or seller of the Refill Products, Defendant issued an express warranty by representing to consumers at the point of purchase that the Refill Products would provide a year-long supply, and that they could hold up to 2176 diapers when that is not true or is misleading when used in the real world.  Defendant's representations were part of the

description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class and Subclass.

65.    In fact, the Refill Products do not conform to Defendants' Duration Claims because the Refill Products cannot provide a year-long supply of diaper disposal product and cannot hold 2176 diapers when used in the real world.  By falsely representing the Refill Products in this way, Defendant breached express warranties.

66.    As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class and Subclass were injured because they: (1) paid money for Refill Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Refill Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Refill Products they purchased had less value than Defendant represented.  Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class and Subclass Members would not have purchased the Refill Products or would not have paid as much as they did for them.

67.    Plaintiff provided Defendant notice of breach within a reasonable time prior to bringing suit, , with confirmation of Defendant's receipt of the notice letter on May 3, 2024.

## COUNT II
## BREACH OF IMPLIED WARRANTY
### (On Behalf The Class and Subclass)

68.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

69.    Plaintiff brings this claim individually and on behalf of the Members of the proposed Class and Subclass against Defendant.  The Class will proceed under

California law, while the Subclass will proceed, in the alternative, according to Florida law.

70.    Defendant routinely engages in the manufacture, distribution, and/or sale of Refill Products and is a merchant that deals in such goods or otherwise holds themselves out as having knowledge or skill particular to the practices and goods involved.

71.    Plaintiff and Members of the Class and Subclass were consumers who purchased Defendant's Refill Products for the ordinary purpose of such products.  In the alternative, Defendant marketed the Refill Products, and Plaintiff and Members of the Class and Subclass purchased the Refill Products, for the specific purpose of obtaining a year's worth of diaper disposal products, but received far less.

72.    By representing that the Refill Products would provide a year-long supply, Defendant impliedly warranted to consumers that the Refill Products were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances.

73.    However, the Refill Products were not of the same average grade, quality, and value as similar goods sold under similar circumstances.  Thus, they were not merchantable and, as such, would not pass without objection in the trade or industry under the contract description.

74.    As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class and Subclass were injured because they paid money for Refill Products that would not pass without objection in the trade or industry under the contract description.

75.    Plaintiff provided Defendant notice of breach within a reasonable time prior to bringing suit, with confirmation of Defendant's receipt of the notice letter on May 3, 2024.

## COUNT III
## FRAUD
### (On Behalf The Class and Subclass)

76.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

77.   Plaintiff brings this claim individually and on behalf of the Members of the proposed Class and Subclass against Defendant.  The Class will proceed under California law, while the Subclass will proceed, in the alternative, according to Florida law.

78.   As discussed above, Defendant made false and misleading statements and omissions concerning material facts on the Product's Labels with respect to the Duration Claims.  These statements and omissions were made with knowledge that the labels are false and misleading.

79.   The statements and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended and actually induced Plaintiffs and Class members to purchase the Products.

80.   The fraudulent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT IV
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201-213
### (On Behalf The Florida Subclass)

81.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

82.   Plaintiff brings this claim individually and on behalf of the members of the proposed Florida Subclass against Defendant.

83.    Plaintiff brings this claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

84.    The FDUTPA renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.

85.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202.

86.    While FDUTPA does not define "deceptive," or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance.  "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc*., 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotations and citations omitted). Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers.  *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc*., 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).  Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injuries to consumers."  *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Sols., Inc*., 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

87.    Defendant engaged in a deceptive act and/or unfair trade practice by manufacturing and marketing the Refill Products as purportedly able to provide a year-long supply of disposal product when that is not true, and that they could hold up to 2176 diapers when that is not true when used in the real world.

88.     Defendant intended that Plaintiff and the Florida Subclass would rely upon their deceptive conduct in the sale of the Refill Products, and a reasonable person would in fact be misled by this deceptive conduct.

89.     Plaintiff and the members of the Florida Subclass have been damaged by Defendant's conduct alleged herein because they would not have purchased the Refill Products but for Defendant's unfair and/or deceptive trade practice.

90.     Therefore, Plaintiff and members of the Florida Subclass have suffered injury in fact, including the full price of the Refill Products purchased.

91.     By committing the acts alleged above, Defendants engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

92.     Defendant's conduct is substantially injurious to consumers. Consumers are purchasing Refill Products, without knowledge that the representation that it provides a "1 YEAR SUPPLY" is false or misleading.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Refill Products but for Defendant's false labeling, advertising, and promotion.  Thus, Plaintiff and members of the Florida Subclass have been "aggrieved" (i.e., lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

93.     Indeed, no benefit to consumers or competition results from Defendant's conduct.  Since consumers reasonably rely on Defendant's representation that its products will contain a year-long supply, as well as in Defendant's marketing of the Refill Products, consumers could not have reasonably avoided such injury.

94.     Further, Defendant's conduct is ongoing on continuing, such that prospective injunctive relief is necessary.

95.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and the members of the Florida Subclass have sustained damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

A.    Certifying the nationwide Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass Members;

B.    Declaring that Defendant's conduct violates the statutes referenced herein;

C.    Finding in favor of Plaintiff, the Class and Subclass against Defendant on all counts asserted herein;

D.    Ordering Defendant to disgorge and make restitution of all monies Defendant acquired by means of the unlawful practices as set forth herein;

E.    Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them all the money they are required to pay;

F.    Awarding Plaintiff and Class and Subclass Members their costs and expenses incurred in the action, including reasonable attorneys' fees;

G.    Ordering Defendant to pay pre-judgment interest on all amounts awarded;

Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  May 24, 2024                           Respectfully Submitted,

**SMITH KRIVOSHEY, PC**

By:___*/s/ Yeremey Krivoshey*_____
         Yeremey Krivoshey

Yeremey O. Krivoshey (SBN 295032)
166 Geary Str STE 1500-1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: (888) 410-0415
E-Mail: yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (SBN 244902)
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Telephone: 617-377-4704
Facsimile: (888) 410-0415
E-Mail: joel@skclassactions.com

*Attorneys for Plaintiff*